No. 50,263

STATE OF KANSAS *ex rel.* CURT T. SCHNEIDER, Attorney General, *Petitioner,* v. THOMAS J. KENNEDY, Director, Alcoholic Beverage Control, *Respondent,* THE KANSAS HOTEL AND MOTEL ASS'N, INC., *Intervenor.*

(587 P.2d 844)

Opinion filed December 5, 1978.

*John R. Martin,* first deputy attorney general, argued the cause, and *Curt T. Schneider,* attorney general, was with him on the brief for the petitioner.

*Benjamin J. Neill,* of department of revenue, argued the cause, and *Alan F. Alderson,* of department of revenue, was with him on the brief for the respondent.

*Charles N. Henson,* of Eidson, Lewis, Porter & Haynes, argued the cause, and *Richard F. Hayse,* of the same firm, was with him on the brief for the intervenor.

*Paul Arabia,* of Wichita, was on the brief *amici curiae,* for The Portobello Club, Inc., and Down Home, Inc.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an original action in quo warranto brought by the attorney general challenging the authority of the Director of the Alcoholic Beverage Control Board to issue licenses to class B clubs where liquor may be sold and served in conjunction with the sale and consumption of food.

The issue in this case is whether the 1978 legislative amendments to K.S.A. 41-2601 *et seq.,* and K.S.A. 41-803, authorize the maintenance of an "open saloon" in violation of article 15, section 10 of the Kansas constitution.

The 1978 Kansas legislature amended the Private Club Act, K.S.A. 41-2601 *et seq.,* to authorize the issuance of liquor licenses for class B clubs which are *licensed food service establishments as defined in K.S.A. 1977 Supp. 36-501.* New section 11 of chapter 186, laws of 1978, provides:

"(*a*)  A club license for a class B club specified in subsection (*b*)(3)(B) of K.S.A.

1977 Supp. 41-2601 and amendments thereto shall allow the licensee to sell and offer for sale alcoholic liquor for consumption on the licensed premises, but only in the same room where food is sold and served with the sale and consumption of such alcoholic liquor.

"*(b)* This section shall be part of and supplemental to K.S.A. 41-2601 to 41-2635, inclusive, and amendments thereto."

The legislature, by amending K.S.A. 41-2601, authorized a new type of class B restaurant-club and defined it as follows:

"(B) A premises which is a licensed food service establishment, as defined by K.S.A. 1977 Supp. 36-501 and amendments thereto, of which not less than fifty percent (50%) of the gross receipts in each calendar year are from the sale of food for consumption on the premises." L. 1978, ch. 186, § 3.

Furthermore, under the new law, class B restaurant-clubs are licensed without membership cards, membership lists, dues, waiting periods, carry-in bottle or liquor pool requirements.

The 1978 legislature also amended the statutory definition of "open saloon." K.S.A. 41-803 of the Liquor Control Act as amended now provides in pertinent part:

"*(a)* It shall be unlawful for any person to own, maintain, operate or conduct either directly or indirectly, an open saloon.

"*(b)* *As used in section 10 of article 15 of the constitution of the state of Kansas* and this section, 'open saloon' means any place, public or private, where alcoholic liquor is sold or offered or kept for sale by the drink or in any quantity of less than two hundred (200) milliliters (6.8 fluid ounces) or sold or offered or kept for sale for consumption on the premises where sold, *but does not include any class B club licensed in accordance with K.S.A. 41-2601 to 41-2634, inclusive, and amendments thereto.*" L. 1978, ch. 189, § 13.

Preliminary to our discussion of the merits of this action, the background of liquor regulation in Kansas should be studied. From the very outset of our state's history, the legality of alcoholic liquor has been a subject of debate, and the state constitution has been the forum for that debate.

At the Wyandotte Constitutional Convention in 1859, a prohibitory provision stating that "the Legislature shall have the power to regulate or prohibit the sale of alcoholic liquor except for mechanical and medicinal purposes" was proposed and subsequently withdrawn. The constitution was adopted without any reference to alcoholic liquor.

In 1880, however, the voters approved the original version of article 15, section 10 of the constitution which provided:

"The manufacture and sale of intoxicating liquors shall be forever prohibited in this state, except for medical, scientific and mechanical purposes."

Thereafter the legislature defined those acts which constituted a manufacture and sale as well as described the substance which could be regarded as intoxicating liquor. It also defined what substances could not be sold for medical, scientific and mechanical purposes. See L. 1881, ch. 128, §§ 2, 10.

Suffice it to say under these laws so-called patent medicines enjoyed a steady increase in popularity. The problems which arose prompted the legislature to respond in 1909 and 1911 by amendments which removed the "medical, scientific and mechanical exception" and substituted a provision which allowed certain wholesale druggists to sell alcohol to registered pharmacists for medicinal purposes. See L. 1909, ch. 164, § 1; L. 1911, ch. 178, § 1. Our court upheld these new laws in numerous cases. Thus, the passage of the 18th amendment to the Constitution of the United States in 1919 prompted little change in an already "dry" Kansas.

In 1933, the 21st amendment to the Constitution, which repealed the 18th amendment, was passed. That same year a special session of the Kansas legislature agreed to submit to the voters of 1934 a proposed amendment to the Kansas constitution which provided:

"The legislature may license and regulate the manufacture, sale, possession and transportation of all liquor having any alcoholic content, and may impose special taxes on all malt, vinous and spirituous liquors, and may provide for the prohibition of such liquors in certain areas." L. 1933, special session, ch. 128, § 1.

*The provision contained no open saloon prohibition and was defeated.*

Soon after, the Kansas legislature in 1937 directed that 3.2% beer was not an intoxicating liquor and authorized its sale by licensees throughout the state. This law is now codified as K.S.A. 41-2701 *et seq.,* and has been consistently upheld by our court. See *e.g. Johnson v. Reno County Comm'rs,* 147 Kan. 211, 212, 75 P.2d 849 (1938); *Linquist v. City of Lindsborg,* 165 Kan. 212, 214-16, 193 P.2d 180 (1948).

In 1947, the legislature proposed the amendment of article 15, section 10 of the constitution to provide:

"The legislature may provide for the prohibition of intoxicating liquors in certain areas. Subject to the foregoing, the legislature may regulate, license and tax the manufacture and sale of intoxicating liquors, and may regulate the possession

and transportation of intoxicating liquors. *The open saloon shall be and is hereby forever prohibited."* L. 1947, ch. 248, § 1. (Emphasis added.)

Unlike the 1933 proposal, *this amendment,* which was approved by the voters of 1948 and remains the law in Kansas today, *prohibits the open saloon.*

Shortly thereafter in 1949, the legislature passed a comprehensive liquor control scheme known as the Kansas Liquor Control Act, now codified at K.S.A. 41-101 *et seq.* For purposes of this section the legislature defined "open saloon" in K.S.A. 41-803 as "any place, public or private, where alcoholic liquor is sold or offered for sale or kept for sale by the drink . . . or sold, offered for sale, or kept for sale for consumption on the premises where sold."

During the years that followed the enactment of the Kansas Liquor Control Act various private clubs were conceived to dispense alcoholic liquor. In *State v. Larkin,* 173 Kan. 112, 244 P.2d 686 (1952), our court overturned one such arrangement as a subterfuge of the Act.

The legislature subsequently responded to the severe law enforcement problem by enacting "The Private Club Act" of 1965. K.S.A. 41-2601 *et seq.* It provided that on and after July 31, 1965, *the consumption of alcoholic liquor at any place* other than that provided in the act "shall be deemed to be the consumption of alcoholic liquor *in a place to which the general public has access."* K.S.A. 41-2603. (Emphasis added.) Under the terms of that Act the Director of the Alcoholic Beverage Control can issue licenses to class A clubs (those which are not operated for profit) and class B clubs (those which are operated for profit). The consumption of alcoholic liquor on the premises of such clubs is deemed to be consumption in a place *to which the general public has no access.* The consumption of liquor by the drink is authorized by the Act (K.S.A. 41-2602) in four places which are defined: (1) Upon private property by those occupying the private property as owner or as the lessee of the owner and by their guests where no charge is made by the owner or lessee for the alcoholic liquor served; (2) at a class A or class B club licensed by the Alcoholic Beverage Control Director; (3) in a lodging room of any hotel, motel or boarding house where the alcoholic liquor is consumed by the occupant or his guests, provided the occupant is not engaged in the sale of liquor; and (4) in a private dining room

of a hotel, motel or restaurant rented for a special occasion for a private party, where there is no sale of the alcoholic liquor.

The Private Club Act of 1965 was upheld in *Tri-State Hotel Co. v. Londerholm,* 195 Kan. 748, 408 P.2d 877 (1965).

*Then, in 1970 the people of Kansas were given the opportunity to amend article 15, section 10 of the constitution to exclude the open saloon prohibition.* See L. 1970, ch. 189, § 1. *The proposition was rejected on November 3, 1970,* by a narrow margin of 346,423 votes against the amendment to 335,094 for it.

For an exhaustive article on the history of intoxicating liquor in Kansas, complete with authoritative citation, see Clark, *Wyatt Earp and the Winelist: Is a Restaurant an "Open Saloon?",* 47 J.B.A.K. 63 (1978).

While the liquor issue remained a topic of heated debate in subsequent years, no significant changes occurred in the law until 1978 when the legislature amended both the Private Club Act, K.S.A. 41-2601 *et seq.,* and K.S.A. 41-803 to authorize the sale of liquor in conjunction with the serving of food by a licensed "food service establishment, as defined by K.S.A. 1977 Supp. 36-501 and amendments thereto."

The validity of this new law was soon challenged in a quo warranto action filed by the attorney general on July 6, 1978, in the Supreme Court of Kansas. Thereafter, a motion by the Kansas Hotel and Motel Association to intervene was filed on July 21, 1978, and subsequently granted on August 2, 1978, and application to file a brief as *amici curiae* was granted to The Portobello Club, Inc., and Down Home, Inc., on August 28, 1978. The attorney general was ordered to file his brief on or before September 28, 1978, and the respondent, intervenor and *amici* were ordered to file briefs by October 12, 1978. The clerk was ordered *on the court's own motion* to advance the case for hearing. The case was advanced and given a preferential setting on the Supreme Court's docket to be heard on October 27, 1978. Motions by *amici curiae* and the intervenor, *both proponents of the liquor legislation,* for an extension of time to file their briefs out of time were denied in order to prevent further delay.

At no time did the petitioner, the respondent, the intervenor or *amici* suggest to the court or request by motion expedited consideration or decision in this case prior to the general election on November 7, 1978.

On this state of the record oral arguments were heard on October 27, 1978. Counsel for the respondent in oral argument to the court on that date requested the court to announce its decision *prior to* certification of the county referendum by the secretary of state. See L. 1978, ch. 186, § 10.

Notwithstanding validity of the legislation was under constitutional attack by the attorney general, at the time of oral argument 45 counties in Kansas were submitting the question concerning the licensing of class B clubs specified in subsection (*b*)(3)(B) of L. 1978, ch. 186, § 3, to the qualified voters of their respective counties at the general election pursuant to L. 1978, ch. 186, § 10.

After duly considering the briefs and oral arguments of the respective parties, the intervenor and *amici curiae* this court entered judgment for the petitioner in *State ex rel. Schneider v. Kennedy,* 225 Kan. 1, 586 P.2d 276 (1978) as follows:

> "After examining the record and giving the matter due consideration we hold, by a divided court, the petitioner's writ of quo warranto shall be granted. The court finds the 1978 legislative amendments to K.S.A. 41-2601 *et seq.,* and K.S.A. 41-803, authorize the maintenance of an 'open saloon' in violation of Article 15, Section 10 of the Kansas constitution.
>
> . . . .
>
> "This brief opinion announcing the decision of the court will be supplemented by a formal opinion to be filed when it is prepared."

With this brief historical background we now consider petitioner's claim that K.S.A. 41-2601 *et seq.,* and K.S.A. 41-803, authorize the maintenance of an open saloon in violation of article 15, section 10 of the constitution.

A brief review of the function of the Supreme Court in determining a constitutional question within the spectrum of our constitutional form of government is in order at this point.

Statements made in *State, ex rel, v. City of Topeka,* 31 Kan. 452, 2 Pac. 593 (1884), that the various branches or departments of the government are simply the *instruments of sovereignty, and not the sovereignty itself,* are explained in *State v. Durein,* 70 Kan. 1, 78 Pac. 152 (1904), *aff'd on rehearing* 70 Kan. 13, 80 Pac. 987 (1905), *aff'd* 208 U.S. 613, 52 L.Ed. 645, 28 S.Ct. 567 (1908), where the court said:

> "But the people have set the constitution over themselves as a limitation upon their own sovereignty, and it is their duty to obey it precisely the same as officials

who are given authority under it. By that instrument a government has been established, and its powers defined and distributed. Among the powers granted are such as are designated legislative, executive, and judicial. These are sovereign powers, and the people, having delegated them to instruments of their own creation, cannot interfere with their exercise. They may meet in their organized political capacity and change the fundamental law, but so long as the constitution stands they cannot legislate, or execute laws, or adjudicate controversies. The recognition of any other doctrine would sound the death-knell of constitutional government.

"It is elementary law that grants of power by state constitutions to state legislatures include all legislative power that is not expressly withheld." (pp. 36,37.)

It is fundamental that our state constitution limits rather than confers powers. Where the constitutionality of a statute is involved, the question presented is, therefore, not whether the act is authorized by the constitution, but whether it is prohibited thereby. *Hunt v. Eddy,* 150 Kan. 1, 90 P.2d 747 (1939); see also *Leek v. Theis,* 217 Kan. 784, 539 P.2d 304 (1975); *Schumacher v. Rausch,* 190 Kan. 239, 372 P.2d 1005 (1962); *State, ex rel., v. Anderson,* 180 Kan. 120, 125, 299 P.2d 1078 (1956).

The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution. *Leek v. Theis,* 217 Kan. at 784, Syl. ¶ 2; see also *Rogers v. Shanahan,* 221 Kan. 221, 223, 565 P.2d 1384 (1976); *State, ex rel., v. Bennett,* 219 Kan. 285, 289, 547 P.2d 786 (1976); *Brown v. Wichita State University,* 219 Kan. 2, 9-10, 547 P.2d 1015 (1976).

In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. *State, ex rel., v. Fadely,* 180 Kan. 652, Syl. ¶ 2, 308 P.2d 537 (1957). See also *Brown v. Wichita State University,* 219 Kan. at 2, Syl. ¶ 3; *Leek v. Theis,* 217 Kan. at 792; *Shelton v. Phalen,* 214 Kan. 54, Syl. ¶ 5, 519 P.2d 754 (1974).

Statutes are not stricken down unless the infringement of the superior law is clear beyond substantial doubt. *Hunt v. Eddy,* 150 Kan. at 2, Syl. ¶ 7; see also *In re Estate of Diebolt,* 187 Kan. 2, 13, 353 P.2d 803 (1960); *State, ex rel., v. Urban Renewal Agency of Kansas City,* 179 Kan. 435, Syl. ¶ 1, 296 P.2d 656 (1956); *State, ex rel., v. Board of Education,* 173 Kan. 780, 790, 252 P.2d 859 (1953).

Courts do not strike down legislative enactments on the mere ground they fail to conform with a strictly legalistic definition on technically correct interpretation of constitutional provisions. The test is rather whether the legislation conforms with the common understanding of the masses at the time they adopted such provisions and the presumption is in favor of the natural and popular meaning in which the words were understood by the adopters. *Hunt v. Eddy,* 150 Kan. at 2, Syl. ¶ 6; *Leek v. Theis,* 217 Kan. at 793; *State, ex rel., v. Highwood Service, Inc.,* 205 Kan. 821, 825, 473 P.2d 97 (1970); *Wall v. Harrison,* 201 Kan. 600, 603, 443 P.2d 266 (1968); *Higgins v. Cardinal Manufacturing Co.,* 188 Kan. 11, 360 P.2d 456 (1961).

The propriety, wisdom, necessity and expedience of legislation are exclusively matters for legislative determination and courts will not invalidate laws, otherwise constitutional, because the members of the court do not consider the statute in the public interest of the state, since, necessarily, what the views of members of the court may be upon the subject is wholly immaterial and it is not the province nor the right of courts to determine the wisdom of legislation touching the public interest as that is a legislative function with which courts cannot interfere. *State, ex rel., v. Fadely,* 180 Kan. at 659; see also *City of Wichita v. White,* 205 Kan. 408, 469 P.2d 287 (1970); *Republic Natural Gas Co. v. Axe,* 197 Kan. 91, 415 P.2d 406 (1966); *Tri-State Hotel Co. v. Londerholm,* 195 Kan. at 760.

All the parties agree the definitional content of the term "open saloon" is not prescribed by the constitution. The petitioner questions whether the legislature has the power to enact controlling definitions of constitutional prohibitions. In *State v. Nelson,* 210 Kan. 439, 502 P.2d 841 (1972), our court held 1971 legislative amendments to the gambling laws which exempted bingo from the statutory definition of lottery unconstitutional. We stated:

"Although a constitution is usually a declaration of principles of fundamental law, many of its provisions being only commands to the legislature to enact laws to carry out the purposes of the framers of the constitution, it is entirely within the power of those who establish and adopt the constitution to make any of its provisions self-executing . . . *Prohibitory provisions in a constitution are self-executing to the extent that anything done in violation of them is void.*

"*It is the function and duty of this court to define constitutional provisions.* The definition should achieve a consistency so that it shall not be taken to mean one thing at one time and another thing at another time. *It is the nature of the judicial process that the construction becomes equally as controlling upon the legislature*

*of the state as the provisions of the constitution itself."* (p. 445.) (Emphasis added.)

It is true as the respondent argues that the legislature may enact legislation to facilitate or assist in the operation of a prohibitory provision provided the legislation adopted is in harmony with and not in derogation of the provisions of the constitution. See *State, ex rel., v. Board of Education,* 212 Kan. 482, Syl. ¶ 7, 511 P.2d 705 (1973). However, this does not give the legislature carte blanche to circumvent the mandates of the constitution.

*Our court must necessarily determine the scope and content of the open saloon prohibition.* We are unaided by the two previous decisions cited by all the parties, the *Larkin* opinion and the *Londerholm* opinion, because the construction or definitional content of the term "open saloon" as used in the Kansas constitution was not in issue.

The petitioner argues the term "open saloon" is synonymous with liquor by the drink, while the respondent contends a licensed food service establishment, as defined by K.S.A. 1977 Supp. 36-501 and amendments thereto, which derives 50% or more of its gross receipts from the sale of food is not an open saloon. The respondent cites *Hammond v. McDonald,* 49 Cal. App. 2d 671, 122 P.2d 332 (1942) and *Denver v. Gushurst,* 120 Colo. 465, 210 P.2d 616 (1949) as authority.

The *Hammond* case, later followed in *Covert v. State Board of Equalization,* 29 Cal. 2d 125, 173 P.2d 545 (1946), relied upon a definition of "saloon" from Webster's New International Dictionary (2d ed. 1934) to mean a place where liquor is sold for consumption on the premises "commonly without meals."

This definition is not controlling for purposes of our determination. In fact, the evolution of the term "saloon" suggests a broader definition is in order. In the 1930 edition of Webster's New International Unabridged Dictionary the term was defined as:

"A place where intoxicating liquors· are sold and drunk; a grogshop; - used commonly of a place where there are no lodgings or regular service of meals as in a hotel."

This definition was subsequently modified to that found in the *Covert* opinion. Today, Webster's Third International Dictionary (1961) simply defines saloon as "a room or public establishment in which alcoholic beverages are sold and consumed." See also

Black's Law Dictionary 1506 (4th ed. rev. 1968); *Marshall v. Smith,* 86 Ohio Abs. 302, 306, 174 N.E.2d 558 (1960).

The California cases, *Hammond* and *Covert,* have no persuasive significance on the issue presently confronting this court. The California *constitution* in effect when these two cases were decided, after vesting in the state the exclusive power to regulate dealings with intoxicating liquors, further provided:

"Intoxicating liquors, other than beers, shall not be consumed, bought, sold, or otherwise disposed of for consumption on the premises, in any public saloon, public bar or public barroom within the State; *provided, however,* that subject to the aforesaid restriction, all intoxicating liquors may be kept and may be bought, sold, served, consumed, and otherwise disposed of in any bona fide hotel, restaurant, cafe, cafeteria, railroad dining or club car, passenger ship, or other public eating place, or in any bona fide club after such club has been lawfully operated for not less than one year." *Hammond v. McDonald,* 49 Cal. App. 2d at 675.

Clearly, the people of Kansas have not granted authority to the legislature in article 15, section 10 of the Kansas constitution as the people of California have done in their state. In California the people have given *express* authority in their constitution to dispense liquor for consumption on the premises in any *bona fide* hotel, restaurant, etc. The prohibition in the Kansas constitution is, "The open saloon shall be and is hereby forever prohibited."

Moreover, the *Gushurst* opinion cited by the respondent is easily distinguishable from the case at bar. There, in referring to a prohibition against the establishment or maintenance of a "saloon" contained in article XXII of the Colorado constitution the court stated:

"We are persuaded, as all parties hereto seem to agree, that the aim, intent, and primary purpose of the people in the adoption of article XXII of the Constitution, and of the general assembly in the passage of the liquor code . . . was to completely outlaw and eradicate the old-time public saloon or barroom with its well-known obnoxious characteristics, vices and effects, and at the same time to authorize, under proper regulations and safeguards, the sale and consumption of intoxicating liquors in bona fide restaurants and hotels." (pp. 469-70.)

Kansas history differs significantly from the history of the State of Colorado.

The Colorado Supreme Court previously held in *Lendholm v. People,* 55 Colo. 467, 136 Pac. 70 (1913), the legislative definition of a "saloon" to be controlling, where it had defined the term as "any place where spirituous or vinous liquors are sold in quanti-

ties of less than one quart." There a restaurant which served any intoxicating liquors was held to be within the prohibition of the statute. The court specifically stated the comparative number of such sales of food and of liquor, or the comparative revenue derived from one or the other was not important. Thereafter the court in *Gushurst* approved *a legislative change* in the definition of a "saloon."

As our history indicates, Kansas was primarily a "dry" state and any argument the open saloon prohibition was intended merely to prohibit the sale of liquor in a particular environment ignores the constitution.

Our court is faced with the construction of the term "open" as well as that of "saloon." Foreign authority aids us little. Oklahoma has a constitutional prohibition regarding the open saloon, but the term is defined in the constitution.

Prior to November 3, 1970, article 16, section 20(a) of the Texas constitution provided:

"The open saloon shall be and is hereby prohibited. The Legislature shall have the power, and it shall be its duty to define the term 'open saloon' and enact laws against such.

"Subject to the foregoing, the Legislature shall have the power to regulate the manufacture, sale, possession and transportation of intoxicating liquors, including the power to establish a State Monopoly on the sale of distilled liquors." *Williams v. State,* 476 S.W.2d 307, 308 (Tex. Crim. 1972).

Under specific provisions of the Texas constitution as quoted, the Texas legislature was free to formulate its own definition of an "open saloon."

In the Kansas constitution the term "open" connotes public as opposed to private and restrictive. The legislative interpretation of "open saloon" in the Private Club Act of 1965 discloses, in substance, that the legislature construed the term "open" to be within the parameters of the court's interpretation of the term in this opinion.

We hold an open saloon is any establishment open to the public, without discrimination, where alcoholic beverages are dispensed or sold and served for consumption on the premises. Thus, under this definition, a food service establishment which is open to the public and dispensing or selling alcoholic beverages for consumption on the premises is an open saloon. The comparative revenue derived from food or alcoholic liquor is immaterial. Therefore this court finds the 1978 legislative amendments to

K.S.A. 41-2601 *et seq.,* and K.S.A. 41-803, authorize the maintenance of an "open saloon" in violation of article 15, section 10 of the Kansas constitution.

As petitioner suggests the real issue in this case is whether the people of the state must be permitted to delete the prohibition against the "open saloon" by constitutional amendment rather than allow the legislature to authorize the sale of liquor by the drink through appropriate legislation. Our court has consistently protected the constitution against subtle and artful attempts to evade and circumvent it. We decline to depart from this role here.

Signals given in the *1978 amendments to the intoxicating liquor statutes* that clearly indicate the legislature was attempting an end run around the Kansas constitutional prohibition of the "open saloon" are briefly summarized.

For 30 years the legislature followed its definition of an "open saloon" as set forth in K.S.A. 41-803 in 1949. It distinguished *private* consumption and sale of intoxicating liquor by the drink from *public* consumption and sale in the Private Club Act of 1965. That definition of an "open saloon" and the enactments which followed are reasonably within the parameters of the construction given the term "open saloon" in the Kansas constitution by the Supreme Court in this opinion.

In 1970 the legislature recognized an amendment to the constitution was required, if the sale of liquor by the drink for consumption on the premises was to be permitted in public places, by submitting to a vote of the people an amendment of article 15, section 10 of the Kansas constitution, but the voters of Kansas defeated the amendment.

Then in 1978 the legislature *assumed* it had the full right to define the term "open saloon" in the constitution because the constitution had not defined an open saloon. See Heinemann, *Legislation 1978,* 47 J.B.A.K. 81, at 101 (1978), and the Governor's message on Senate bill 952, L. 1978, p. 1803. This is emphatically illustrated by the 1978 amendment of K.S.A. 41-803(*b*) which reads:

"*As used in section 10 of article 15 of the constitution of the state of Kansas and* this section, 'open saloon' means any place, public or private, where alcoholic liquor is sold or offered or kept for sale by the drink or in any quantity of less than two hundred (200) milliliters (6.8 fluid ounces) or sold or offered or kept for sale for consumption on the premises where sold, *but does not include any class B club licensed in accordance with K.S.A. 41-2601 to 41-2634, inclusive, and amendments thereto.*" L. 1978, ch. 189, § 13.

By this amendment the legislature disclosed it was redefining "open saloon" as used in section 10 of article 15 of the constitution of the State of Kansas. The people of Kansas, however, did not give the legislature the right to define an "open saloon" in the Kansas constitution.

Further, by amending the *Private* Club Act of 1965 (K.S.A. 41-2601 *et seq.*), which authorized private and restrictive consumption of liquor by the drink on certain premises, the legislature, in substance, did an about face and converted *private* to *public* by authorizing new class B clubs which were open to the general *public* to sell liquor by the drink for consumption on the premises.

It is argued the sale of liquor by the drink in *bona fide restaurants* is merely incidental to the sale of food which is served in the same room where the alcoholic liquor is sold for consumption. Although it is not necessary or material to this decision where we hold the dispensing or sale of any amount of intoxicating liquor in an establishment open to the public for consumption on the premises is violative of the constitutional prohibition, the nebulous character of this argument is illustrative. Nowhere does the legislature in the 1978 amendments to the intoxicating liquor laws use the term "bona fide restaurant." It authorized the sale of intoxicating liquor in a "licensed food service establishment" as defined in K.S.A. 1977 Supp. 36-501 and amendments thereto, which reads:

"(e) 'Food service establishment' means any place in which food is served or is prepared for sale or service on the premises or elsewhere. Such term shall include, but not be limited to, fixed or mobile restaurant, *coffee shop,* cafeteria, *short-order cafe, luncheonette, grill, tea room, sandwich shop, soda fountain, tavern,* private club, *roadside stand, industrial-feeding establishment,* catering kitchen, commissary and any other private, public or nonprofit organization or institution routinely serving food *and any other eating or drinking establishment or operation where food is served or provided for the public* with or without charge." (Emphasis added.)

Note in particular the public establishments emphasized where the legislature would authorize the sale of liquor by the drink for consumption on the premises. We hold the petitioner's writ of quo warranto shall be granted.

The respondent is prohibited from the issuance of any class B club licenses as designated in subsection (*b*)(3)(B) of L. 1978, ch. 186, § 3.

McFarland, J., concurring: Think of the word "saloon" and the image that comes to mind is of swinging doors, swaggering gunfighters, and painted women with hearts of gold. This is the picture that Hollywood has painted for us of the Old West. A modern restaurant serving drinks to its customers just does not fit our mental picture of a saloon.

If this case involved what a saloon was in 1865 or 1870, perhaps the Hollywood image could be considered on the basis of whether it was historically accurate. But that question is not before us. What this Court has to decide is what "open saloon" meant in 1948 when article 15, section 10 of the Kansas constitution was amended. The provision, prior to amendment, stated:

"The manufacture and sale of intoxicating liquors shall be forever prohibited in this state, except for medical, scientific and mechanical purposes."

The amendment of 1948 stated:

"The legislature may provide for the prohibition of intoxicating liquors in certain areas. Subject to the foregoing, the legislature may regulate, license and tax the manufacture and sale of intoxicating liquors, and may regulate the possession and transportation of intoxicating liquors. The open saloon shall be and is hereby forever prohibited."

The question then is precisely what did the people of Kansas intend to forever prohibit when they voted that "the open saloon shall be and is hereby forever prohibited"?

Strangely enough the word "saloon" had not, prior to 1948, been defined by either the legislature or the courts of Kansas. The best evidence of what the term "open saloon" was intended to encompass is found in the definition enacted by the 1949 Kansas Legislature as found in K.S.A. 41-803 as follows:

"It shall be unlawful for any person to own, maintain, operate or conduct either directly or indirectly, an open saloon. For the purposes of this section, the words 'open saloon' mean any place, public or private, where alcoholic liquor is sold or offered for sale or kept for sale by the drink or in any quantity of less than one-half pint, or sold, offered for sale, or kept for sale for consumption on the premises where sold. Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not more than five hundred dollars ($500) and by imprisonment for not more than ninety (90) days."

Just four months after "open saloon" was amended into our constitution, we see that the term was defined as any place where

liquor by the drink is sold. This definition is clearly contrary to the present amended definition in question, which was enacted almost 30 years after the constitutional prohibition. Was the 1949 definition unreasonable and not in accord with other legal definitions of saloon? Let us look at how some other jurisdictions have defined the term:

Alabama — The "saloon," in common parlance, is a place where intoxicating liquors are sold. *Fourment v. State,* 155 Ala. 109, 113, 46 So. 266 (1908).

Minnesota — A "saloon" is a place where liquors are kept for sale to the retail trade. *Kelly v. Theo. Hamm Brewing Co.,* 140 Minn. 371, 374, 168 N.W. 131 (1918).

Nebraska — The word "saloon," which originally meant a large public room or parlor, has now acquired a more restricted meaning, and is usually applied to a place where intoxicating liquors are sold. *McDougall v. Giacomini,* 13 Neb. 431, 434, 14 N.W. 150 (1882).

New Jersey — A "saloon" is a place where intoxicating liquors are sold or consumed. *Proprietors' Realty Co. v. Wohltmann,* 95 N.J.L. 303, 112 A. 410 (1921).

Texas — A "saloon" is a place of refreshment. In common parlance, the word "saloon" is used to designate a place where intoxicating liquors are sold. *Hinton v. State,* 137 Tex. Crim. 352 356, 129 S.W.2d 670 (1939).

United States case law on the subject is summarized in the legal encyclopedia, Corpus Juris Secundum, in volume 48 at pages 149-150, wherein it is stated:

"As a word of modern origin, the term 'saloon' has a very definite general meaning, which is well-known, and generally understood as a place where intoxicating liquors are sold at retail, and consumed or drunk; a building or place where liquors are kept for sale at retail . . . ."

Some dictionary definitions of "saloon" are as follows:

Random House Dictionary of the English Language (unabridged ed. 1970): "1. *U.S.* a place for the sale and consumption of alcoholic drinks."

Webster's New Collegiate Dictionary (1977): "3c. a room or establishment in which alcoholic beverages are sold and consumed."

Webster's Third New International Dictionary (1961): "d: a room or public establishment in which alcoholic beverages are sold and consumed: barroom, taproom."

Black's Law Dictionary (4th ed. rev. 1968): "A place of refreshment. An apartment for a specified public use. In common parlance, a place where intoxicating liquors are sold and consumed." (Citations omitted.)

The common thread that runs throughout these various definitions including the 1949 Kansas definition is the selling of liquor by the drink—the sale of liquor for consumption on the premises.

The consumption of alcoholic beverages in private clubs is easily distinguished as the clubs are not "open" to the public and are not "saloons" because they do not sell liquor.

We have a constitutional form of government. The constitution provides the basic framework for government. It is difficult to change a constitutional provision, and rightly so. Members of legislatures come and go. The basic framework on which our government rests should not be subject to change by caprice, whim, or shrewd political maneuvering. The constitution cannot be changed in a "smoke-filled room" by a handful of politicians in the middle of the night. Change comes in the light of day with the vote of the people after ample opportunity for all sides to be heard. If the open saloon prohibition is to be changed, it must be done in the same manner that it was put into the constitution. That is, by the majority of all the voters of Kansas.

If the term "open saloon" can be defined and redefined by legislative act, thereby changing the Kansas constitution without amendment, then why not yet another redefinition in a year or two limiting an open saloon to a drinking establishment with swinging doors and a portrait of a reclining plump female nude behind the bar?

I must therefore concur that "open saloon" encompasses any place open to the public where liquor by the drink is sold and join in the majority opinion.

OWSLEY, J., joins in the foregoing concurring opinion.

HOLMES, J., dissenting. I cannot concur in the decision of the majority and therefore must respectfully register my dissent. I have no quarrel with the scholarly presentation of the history of liquor regulation in Kansas or the principles of statutory construction under our constitutional form of government as set forth in the majority opinion. It is the application of these principles to the issues in this case where we disagree. I would also agree that our prior cases of *State v. Larkin*, 173 Kan. 112, 244 P.2d 686 (1952) and *Tri-State Hotel Co. v. Londerholm*, 195 Kan. 748, 408 P.2d 877 (1965), which are cited and relied upon by various counsel, while informative, are not determinative of this case. As stated by the majority, the issue in this case is whether the 1978 legislative amendments to K.S.A. 41-2601 *et seq.*, and K.S.A.

41-803, authorize the maintenance of an "open saloon" in violation of article 15, section 10 of the Kansas constitution. A determination of this issue requires this court to define the term "open saloon" at least to the extent of whether the so-called new type of "restaurant-club" contemplated by the legislative amendments is an open saloon banned by the constitution.

The majority equates the term "open saloon" as used in the constitution with the "sale of liquor by the drink." On the other hand, I equate the "open saloon" provision with the type of establishment or premises that attempts to provide liquor to the public. The sale of liquor by the drink is not the determining or controlling factor in the definition of the term "open saloon."

Without unduly repeating the background material so adequately set forth in the majority opinion, there are a few additional factors which appear relevant to a determination of the issues. In 1948, after sixty-eight years of bone-dry provisions in our constitution, article 15, section 10 was changed by a vote of the people to provide:

"The legislature may provide for the prohibition of intoxicating liquors in certain areas. Subject to the foregoing, the legislature may regulate, license and tax the manufacture and sale of intoxicating liquors, and may regulate the possession and transportation of intoxicating liquors. The open saloon shall be and is hereby forever prohibited."

The first two sentences of the amendment do nothing more than state what would be the power of the legislature absent any liquor provision at all. "It is well settled that the state, through its legislature, may exercise any governmental powers not granted to federal government and not prohibited by our constitution." *State, ex rel., v. State Commission of Revenue and Taxation,* 163 Kan. 240, 247, 181 P.2d 532 (1947). It is therefore only the final sentence which is operative and provides any limitation on the power of the legislature. While the permissive portions of section 10 do no more than repeat certain powers which would otherwise be held by the legislature, it is interesting to note that the language does specifically include the power to ". . . regulate, license and tax the . . . sale of intoxicating liquors." Nowhere does the constitution attempt to prevent the sale of liquor by the drink. The only prohibition is against the "open saloon" which the constitution does not attempt to define and not having done so, it must be presumed that the term was considered one of common knowledge at the time.

In 1947, the legislature determined to submit to the people an amendment to the constitution which would do away with the bone-dry law. Several proposed amendments were considered by both houses of the legislature before the language that ultimately became section 10 of article 15 was adopted. As a part of the attempt to draft a proposed amendment the research department of the legislative council submitted to the legislature a report summarizing constitutional and statutory regulations of the manufacture and sale of alcoholic liquor in each state. (State Regulation of Alcoholic Beverages, Kansas Legislative Research Department [1947].) Included on page 1 of the report was a list of five (5) states in which the open saloon was prohibited in one form or another. This report also contained an explanation of the various options available to the legislature. The options ranged from a South Carolina provision prohibiting the sale of alcoholic beverages ". . . to be drunk on the premises . . ." (art. 8, § 11, South Carolina constitution), to the Texas approach directing the legislature to define the term "open saloon" (art. 16, § 20, Texas constitution). The Kansas Legislature chose a middle road much the same as Colorado had done when it provided ". . . no such laws shall ever authorize the establishment or maintenance of any saloon" (art. XXII, § 1, Colorado constitution).

On January 22, 1947, prior to the amendment adopted by the 1947 Legislature, Senate Concurrent Resolution 3 was introduced and provided:

"The legislature may regulate, license and tax the manufacture and sale of intoxicating liquors but the sale of intoxicating liquors other than in unopened containers containing one-half pint, or more, shall be forever prohibited in this state."

This proposed amendment was tantamount to a specific prohibition of the sale of liquor by the drink and was not acceptable to the legislature. Thus it is clear that the 1947 Legislature, after considering the banning of liquor by the drink, chose to ban the much less restrictive "open saloon" instead. The legislature recognized the two terms did not have the same meaning or it would undoubtedly have selected the more definite and concise language. The logical conclusion from this selection of language is that the legislature, speaking on behalf of the people, did not choose to ban all sales of liquor by the drink.

The legislative history of a constitutional enactment may be considered by the court in ascertaining the proper construction of a phrase of doubtful meaning. 16 Am.Jur.2d, Constitutional Law §§ 64, 88; *State, ex rel., v. Anderson,* 180 Kan. 120, 299 P.2d 1078 (1956). The intent of the framers is to be considered as well as that of the people. *Hunt v. Eddy,* 150 Kan. 1, 90 P.2d 747 (1939).

The majority quotes extensively from several dictionaries and opinions of other states defining the term saloon, open saloon or public saloon and then chooses to ignore these authorities with the bald statement:

"As our history indicates, Kansas was primarily a 'dry' state and any argument the open saloon was intended merely to prohibit the sale of liquor in a particular environment ignores the constitution."

While it is undoubtedly true that this court has the final duty and obligation to define constitutional provisions not defined in the constitution itself, the legislature has the power and the duty to adopt legislation to carry out the provisions of the constitution to the extent such legislation does not conflict therewith. *State, ex rel., v. Board of Education,* 212 Kan. 482, 511 P.2d 705 (1973).

"This court is by the Constitution not made the critic of the legislature, but rather, the guardian of the Constitution; and every legislative act comes before this court surrounded with the presumption of constitutionality. That presumption continues until the Act under review clearly appears to contravene some provision of the Constitution. All doubts of invalidity must be resolved in favor of the law. It is not in our province to weigh the desirability of social or economic policy underlying the statute or to question its wisdom; those are purely legislative matters." *Tri-State Hotel Co. v. Londerholm,* 195 Kan. at 760.

Can it be said the legislature in 1947 and the electorate in 1948 *clearly* intended the term "sale of liquor by the drink" to be synonymous with the term "open saloon" as used in the constitution? I think not. While we may like to think so, the people of Kansas in 1948, as at any other time, were not much different from people in Colorado, Texas, California, New York or any other state. The majority's decision that the "sale" of liquor by the drink is determinative of what is an "open saloon" appears to be based upon the statutory definitions adopted by the legislature for the purpose of the liquor control and private club acts although it is conceded those definitions and the cases resulting therefrom are not controlling in a determination of the meaning of the provision in the constitution. It is more realistic to assume that

the term "open saloon" referred to the type of premises and business establishment wherein liquor is sold to the public. The legislature having specifically selected the term "open saloon" rather than sale by the drink, impels us to turn to other authority in determining the general understanding of the term.

45 Am.Jur.2d, Intoxicating Liquors § 20, p. 498, defines saloon in the following terms:

"The words 'bar,' 'barroom,' and 'saloon,' as used in liquor laws, mean rooms or places where intoxicating liquors are sold and drunk, commonly without meals."

The California constitution, in effect in 1947, provided in part:

"Intoxicating liquors, other than beers, shall not be consumed, bought, sold, or otherwise disposed of for consumption on the premises, in any public saloon, public bar or public barroom within the State; provided, however, that *subject to the aforesaid restriction,* all intoxicating liquors may be kept and may be bought, sold, served, consumed, and otherwise disposed of in any bona fide hotel, restaurant, cafe, cafeteria, railroad dining or club car, passenger ship, or other public eating place, or in any bona fide club after such club has been lawfully operated for not less than one year." Art. 20, § 22. (Emphasis added.)

The majority would distinguish the California constitution as specifically providing for sales in bona fide restaurants, but while the proviso in the California constitution does allow sales in hotels, restaurants, etc., they are always subject to the restriction that *there shall be no such sales in any public saloon. Covert v. State Board of Equalization,* 29 Cal. 2d 125, 135, 173 P.2d 545 (1946). Therefore, the definition placed upon the term "public saloon" by the California courts is relevant in our attempt to define the term. In *Hammond v. McDonald,* 49 Cal. App. 2d 671, 122 P.2d 332 (1942), the court states:

"No definitions of the terms used appear in the Constitution. In absence of such definitions, the words, having no technical meaning, will be taken in the ordinary and generally accepted sense. [Citations omitted.] The words 'saloon' and 'barroom,' as used in connection with the sale of intoxicating liquor, import a place where such liquors are sold for consumption on the premises [citations omitted]; to which Webster's New International Dictionary, 2d ed., first published in 1934, adds, in case of a saloon, that such sales are 'commonly without meals.' . . . It is a matter of common knowledge of which we may take judicial notice, that the saloons and barrooms existing before the enactment of prohibition, which undoubtedly it was the intent of this constitutional amendment to prohibit, were not devoted to the furnishing of meals. They did, in some cases, furnish 'free lunches,' usually of rather minor character; but the business for which they were established was the selling of intoxicating liquor for consumption on the premises, and any furnishing of food or meals was purely incidental to that business. Persons whose main object was the obtaining of meals,

even if they desired drinks of intoxicants with them, went to restaurants and cafés, whose principal business was the serving of meals, not of intoxicants." pp. 684-85. See also *Covert v. State Board of Equalization*, 29 Cal. 2d 125, 173 P.2d 545 (1946).

## Colorado's constitutional provision is strikingly similar to ours.

"On the thirtieth day of June, 1933, all statutory laws of the state of Colorado heretofore enacted concerning or relating to intoxicating liquors shall become void and of no effect; and from and after July 1st, 1933, the manufacture, sale and distribution of all intoxicating liquors, wholly within the State of Colorado, shall, subject to the Constitution and laws of the United States, be performed exclusively by or through such agencies and under such regulations as may hereafter be provided by statutory laws of the State of Colorado; but *no such laws shall ever authorize the establishment or maintenance of any saloon."* Colorado constitution, art. XXII, § 1. (Emphasis added).

## In the case of *Denver v. Gushurst,* 120 Colo. 465, 210 P.2d 616 (1949), the court stated:

"We are persuaded . . . that the aim, intent, and primary purpose of the people in the adoption of article XXII of the Constitution, and of the general assembly in the passage of the liquor code . . . was to completely outlaw and eradicate the old-time public saloon or barroom with its well-known obnoxious characteristics, vices and effects, and at the same time to authorize, under proper regulations and safeguards, the sale and consumption of intoxicating liquors in bona fide restaurants and hotels." p. 469-470.

## The majority would dispose of the Colorado approach to the problem with a one-line statement declaring Kansas history differs from Colorado history.

## In *National Railroad Passenger Corporation v. Harris,* 354 F. Supp. 887 (1972), (judgment vacated on other grounds, 490 F.2d 572 [10th Cir. 1974]), Judge Chandler comments on a place that may be reasonably considered an open saloon under the Oklahoma constitution:

"Although Webster's Seventh New Collegiate Dictionary defines *'saloon'* as 'a room or establishment in which alcoholic beverages are sold and consumed' (Barroom - Taproom), this definition is not the meaning of *'open* saloon' as commonly used and understood.

"The 1930 edition of Webster's New International Unabridged Dictionary of the English Language defines 'saloon' as

'A place where intoxicating liquors are sold and drunk; a grogshop; - used commonly of a place where there are no lodgings or regular service of meals as in a hotel.'

"Webster's New International Unabridged Dictionary, Second Edition 1944 defines 'saloon' as

'5.a U.S. A shop where intoxicating liquors are sold and drunk, commonly without meals.'

"The Court is of an age that he can and does take judicial notice that prior to the adoption of the Eighteenth Amendment there were many respectable places where liquor was sold by the drink - hotel bars, cocktail lounges, private clubs, restaurants, etc., which were not in any sense considered 'open saloons' although *all* except the private clubs were open to the public. They were considered respectable 'places' while the 'open saloon' as commonly understood was considered quite the opposite. 'Open saloon' had a much narrower, very graphic meaning: it connoted a sordid, evil place. To quote Milton: 'Through the gate wide open and unguarded, Satan passed.' And there is reason to suspect the Oklahoma voters had such a 'place' in mind when they adopted Article 27, § 4 of the Oklahoma Constitution and that they were misled and deceived." pp. 893-94.

Thus it is that in those states which have had an opportunity to define the term "saloon" for constitutional purposes, the determination has been based upon the type of premises involved and the business carried on therein, not upon whether a "sale" of liquor by the drink takes place. Since it is clear that the Kansas legislature did not accept the "sale" concept in its drafting of the constitutional amendment, subsequently approved by the electorate, the cases from other states defining the term on a physical premises basis combined with reasonable safeguards and regulation seem persuasive and logical. With the restrictions incorporated in the legislative amendments adopted in 1978, restaurants authorized to sell liquor by the drink to the public are, in no sense of the word, "saloons."

In *Higgins v. Cardinal Manufacturing Co.,* 188 Kan. 11, 360 P.2d 456 (1961), this court stated:

"A constitution must be interpreted liberally to carry into effect the principles of government it embodies. It deals broadly with general subjects, and its language should not be interpreted in any narrow, refined or subtle sense, but should be held to mean what the words imply to the common understanding of men. (*State v. Sessions,* 84 Kan. 856, 115 Pac. 641.) The constitution is not to be construed in a technical manner, but in ascertaining its meaning the courts consider the circumstances attending its adoption and what appears to have been the understanding of the people when they adopted it." p. 18-19.

The limitations in the 1978 amendments placed upon the sale of liquor in restaurants which derive not less than 50% of their gross receipts from the sale of food for consumption on the premises and in which liquor is only sold and served in the same room where food is sold and served certainly results in establishments which are a far cry from the open saloon. While it is obvious from the majority opinion, the discussion of the proposed legislative amendments in both houses of the legislature,

editorial comments, legal articles and numerous other sources, that the decision before the court has been considered a close constitutional question with appealing arguments and authorities on both sides, I cannot agree with the reasoning and results of the majority opinion. In applying the time-honored principles of statutory construction as set forth in the majority opinion, including the strong presumptions of validity, I can reach no other conclusion than that the action of the 1978 legislature did not result in the authorization of open saloons in Kansas and does not violate article 15, section 10 of the Kansas constitution.

Justice McFarland, in her concurring opinion, would have us believe that the good people of Kansas in 1948 did not know, apart from television, movies and history books, what encompassed an open saloon.

Anyone who thinks that because Kansas had experienced constitutional prohibition since 1880, the legislators of 1947 and voters of 1948 did not know the difference between the sale of liquor by the drink and an open saloon, has his or her head in the sand. In the late 1930's and through the 1940's, any high school senior in Sedgwick County could lead one to any number of establishments resembling the popular version of the open saloon. Although usually called clubs, some had fully equipped and staffed casinos in the style of Las Vegas, most had their row of one-armed bandits standing inside the main door (which quite often was in the back), many had dancing girls, card tables, a friendly bootlegger standing by, and all the other "finer things of life" associated with the historic version of an open saloon. True, these establishments also had liquor by the drink, but they were not the places one took his family to enjoy a good meal with a cocktail before dinner and wine with the food. And Sedgwick County was no different than many other counties and areas in Kansas. The people of Kansas in 1948 did not have to resort to the history books to know that the open saloon encompassed far more than the ability to purchase a drink of liquor in an establishment devoted primarily to the sale of food, and under rigid license, inspection and control by the State.

My learned colleague cites numerous dictionary definitions and one-sentence excerpts from numerous cases purporting to describe a "saloon." The gist of all these authorities is that a saloon is a place which sells liquor presumably for consumption

on the premises. I agree wholeheartedly. Certainly no one can argue with the statement that a saloon is a place that sells liquor. However, to say, as the majority does, that because a saloon sells liquor, all places that sell liquor are saloons, is tantamount to saying that because chickens have feathers, all birds with feathers are chickens. It just is not so.

To summarize, I am of the opinion the prohibition of the "open saloon" in our constitution does not prohibit the doing of an act, that is, the sale of liquor by the drink, but does prohibit a certain type of premises or business operation, that is, a public bar whose principal business is the sale of liquor for consumption on the premises. The legislature has the power to adopt reasonable classifications in the performance of its obligations under article 15, section 10 and the designation of restaurants, whose principal function is the sale of food, to sell liquor by the drink under the restrictions set forth in the 1978 amendments to the statutes is reasonable and therefore constitutional.

For the reasons indicated, I would hold that the 1978 amendments to K.S.A. 41-2601 *et seq.,* and K.S.A. 41-803, are constitutional and the petitioner's request for a writ of quo warranto should be denied.

PRAGER and MILLER, JJ., join in the foregoing dissent.